IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>NATHAN DUTCHIE,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:07-CR-537-TC |

Defendant Nathan Dutchie, an enrolled member of the Ute Mountain Ute Indian Tribe, has been charged with Second Degree Murder Within Indian Country.  On August 12, 2007, Mr. Dutchie allegedly shot and killed Jennifer Cantsee.  The responding officers, after detaining Mr. Dutchie, briefly questioned him about the gun's whereabouts without giving him a <u>Miranda</u> warning.  Then, the police entered his home without a warrant and seized a handgun and live .38 caliber bullets.  The next day, an FBI agent interviewed Mr. Dutchie.  At the beginning of the interview, the agent advised Mr. Dutchie of his <u>Miranda</u> rights, after which Mr. Dutchie signed a consent form waiving his right to counsel and his right to remain silent.  Mr. Dutchie then confessed.

Mr. Dutchie has filed a Motion to Suppress his statements, the gun, and the ammunition, asserting that the government obtained the evidence in violation of his Fourth and Fifth Amendment rights.  In his motion, he contends that (1) the warrantless search of his home was not justified by any exception to the warrant requirement; (2) his August 12, 2007 statements

were obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), because the officers

questioned him at the scene while he was in custody without giving him a <u>Miranda</u> warning; and

(3) his August 13, 2007 statements to an FBI agent are inadmissible because Mr. Dutchie did not

voluntarily, knowingly, or intelligently waive his <u>Miranda</u> rights.

For the reasons set forth below, Mr. Dutchie's Motion to Suppress is DENIED IN PART

AND GRANTED IN PART.

## FINDINGS OF FACT[1]

A.    <u>August 12, 2007 Search</u>

On August 12, 2007, the San Juan County Sheriff's Office received a 911 call reporting a

shooting at 48 Cowboy Street[2] on the White Mesa Ute Indian Reservation.  Deputy Sheriff Jaren

Adams and Deputy Hillhouse responded to the call, arriving in their patrol car at 48 Cowboy

Street around 9:00 p.m.  By then, it was dark outside.

Deputy Adams pulled into the driveway of 48 Cowboy Street, where his car headlights

and spotlight illuminated the carport next to the house.  As he pulled into the driveway, Deputy

Adams saw two men running from the carport into the house.  A body was lying on the carport

floor in a pool of blood.  (The victim was later identified as Jennifer Cantsee, Mr. Dutchie's

---

[1]Unless otherwise noted, the facts are taken from the testimony presented during the evidentiary hearings on Mr. Dutchie's Motion to Suppress.  (<u>See</u> Apr. 11, 2008 Tr. of Evidentiary Hr'g on Def.'s Mot. Suppress ("1st Tr."); Apr. 22, 2008 Tr. of Evidentiary Hr'g (Continued) on the Def.'s Mot. Suppress ("2nd Tr.").)

[2]48 Cowboy Street was Mr. Dutchie's house, although the officers did not know that until after the August 12, 2007 search and questioning occurred.

girlfriend.[3])  No gun was visible.

Less than a minute after Deputies Adams and Hillhouse arrived, Deputy Laws and Deputy Dyer pulled up, each in his own patrol car.  On Deputy Adams' order, to prevent an escape, Deputy Law went to the north side of the house, and Deputy Dyer went to the south side of the house.  Then Deputy Adams, using the loudspeaker in his car, ordered the two men to come out of the house.

After several commands, Mr. Dutchie came out.  The officers handcuffed him, searched him for weapons (they found none), and sat him down behind Deputy Adams' patrol car.  (At that point, approximately two to three minutes had passed since the first officers arrived.)  Mr. Dutchie was apparently very intoxicated.  When he was placed in handcuffs, he asked, "Why are you doing this to me?"  (1st Tr. at 21.)  He began to cry, apparently because his girlfriend was dead.

Then another man—Erwin Nelson, also known as "Chainsaw"—came out of the house. He too was searched for weapons (none were found).  But because the handcuffs were too small for Mr. Nelson's wrists and because Mr. Nelson's manner was docile, the officers did not physically secure him; instead, they made him sit down along the yard's fence line with his hands visible and they watched him.

The officers did not give a <u>Miranda</u> warning to Mr. Dutchie or Mr. Nelson that evening. But they did ask Mr. Dutchie and Mr. Nelson some questions.

First, Deputy Adams asked Mr. Dutchie and Mr. Nelson if anyone else was in the house.

---

[3]Officer Hillhouse checked Ms. Cantsee for signs of life after the officers had secured the area, but she had been shot in the head, had no pulse, and was not breathing.

Both said no.

Then Deputy Adams asked Mr. Dutchie "where the gun was at."  (1st Tr. at 10.)
According to Deputy Adams, Mr. Dutchie "said that he didn't know.  That he just threw it in the
door – you know, in the room where the living – in the living room where the T.V. was at."  (Id.)
Deputy Adams explained that he asked Mr. Dutchie where the gun was because "we had a
shooting.  We wanted to secure a weapon for officer safety as well as the public that is around.
We wanted to make sure that we had a safe scene."  (Id.)  Deputy Adams asked Mr. Nelson the
same question.  "[Mr. Nelson] said he didn't know where the gun was at.  He just heard Mr.
Dutchie . . . throw it in the room, and he didn't know where it went.  He just heard it bounce off
something or – when it landed."  (1st Tr. at 11-12.)

Deputy Adams also asked Mr. Dutchie "what kind of gun it was."  (Id. at 11.)  Mr.
Dutchie said it was a "small handgun."  (Id.)  Deputy Adams' reason for asking that question was
"[s]o if I came across it, I know we had the right gun.  We knew we had things secured and could
go on with the investigation."  (Id.)

At this point, Deputy Adams did not know whether either man was responsible for the
shooting.  He did not know who lived at 48 Cowboy Street.  And he did not know whether
anyone else was inside the house (given the situation, he understandably did not trust Mr.
Dutchie's and Mr. Nelson's response that they were the only ones in the house).

Deputy Adams and Deputy Hillhouse went into the house to check whether anyone was
inside.  (They did not ask Mr. Dutchie for permission to go into the house.)  The two officers did
a "quick sweep through" (id. at 12) and did not find anybody in the house.  But, according to
Deputy Adams,

> [t]he last room that we checked, we went in, noticed two or three rifles in a gun
> cabinet, some .38 bullets, caliber bullets, on the floor, also a .38 caliber box up on
> top of the gun cabinet.  The closet was open and there was a dresser drawer that
> had been pulled out that was there that – and I noticed a small nylon gun case – or
> holster I mean laying there.  There was no gun there with it.

(1st Tr. at 13.)

Deputy Adams also testified that when he went into the house, he noticed that the back

door was wide open:

> I didn't know if I had a third-party that may have left out the back door.  Again, I
> didn't know who my suspect was, so that was a concern for out there.  If you go
> out that door – actually I looked out the back door just to take a quick look.
> There's weeds and brush out back, and then you've got the fence line.  But back
> beyond that, on the other property, they have – there's a community center there.
> So whether – when I'm trying to secure the scene and I've decided there's no
> people there, and we were looking to secure a weapon, my concern was is there a
> weapon outside that somebody else could get a hold of? . . . [The back yard was]
> accessible over the [short chain link] fences.

(1st Tr. at 13-14.)  Deputy Adams was concerned about the missing gun because, based on his

familiarity with the neighborhood, he knew that children play outside in the area.  (But there was

no evidence that children were actually in the area.)  He also spoke of his more immediate

concern – that a crowd was gathering in the front of the house while the officers were searching

for the gun (although backup officers had been called).  Despite Deputy Adams' concerns, none

of the officers searched outside the house.[4]

After Deputies Adams and Hillhouse determined that no one was hiding in the house,

---

[4]Deputy Adams testified that approximately ten minutes elapsed from the time he entered
the house until they found the gun.  When asked what he would have done if he had been unable
to locate the gun inside the house, he said he would have "broadened the search for around the
building outside, maybe mostly focused to the back where the door was seen open, but we would
have broadened it."  (1st Tr. at 18.)

Deputy Hillhouse left the house and told the other officers that "the house was clear" (id. at 15) but that no handgun had been found.

Deputy Adams stayed in the house, and Deputy Laws came inside.  The two of them continued to search the living room for the gun.  They "looked a little harder," meaning "[t]he first time going through you're looking for a body, people, so certain places that may be in plain view that a body obviously isn't going to be, but we looked and that's where I saw the .38 caliber bullets on the [bottom shelf of the] coffee table. . . ."  (1st Tr. at 29.)

When Deputy Dyer, who was guarding Mr. Dutchie and Mr. Nelson, heard that no gun had been found, he said to Mr. Dutchie, "'They didn't find the gun.  Where is the gun?'" (Id. at 39.)  Mr. Dutchie responded that the gun "was in the living room, the T.V. area."  (Id.)  Deputy Dyer then said, "'They looked there and it wasn't found.'"  (Id.)  Mr. Dutchie replied, "'Well, maybe it's in my room, the far end of the hall on the left.'"  (Id.)  Based on what Mr. Dutchie said, Deputy Dyer, using the radio, told Deputy Adams to look in Mr. Dutchie's bedroom.

So Deputies Adams and Laws searched the bedroom.  They lifted up the mattress, looked under the bed, and opened the drawers, but they did not find a handgun.

They went back into the living room.  They picked up the couch to look underneath it, and they heard "something solid hit the floor behind the couch, looked over behind the couch and you could see the gun lodged back between the wall and on the floor at that time."  (Id. at 33.) They determined they had found the gun they were looking for so they stopped the search.  They left the gun there and waited for an FBI agent to arrive. (The FBI later seized the gun as evidence.)

Approximately twenty minutes later, around 9:30 p.m., FBI Special Agent Matt Larson

6

arrived.  For reasons not relevant here, Mr. Dutchie was detained at the house until 1:00 a.m.

During that time, the FBI made no attempt to obtain a search warrant.  (The San Juan County

Sheriff's Office does not have authority to obtain a search warrant for sites on federal land.)

Around 1:00 a.m., Mr. Dutchie was taken to the San Juan County Jail.

**B.**      **August 13, 2007 Interview of Mr. Dutchie**

The next day, around noon, FBI Special Agent Matt Larson interviewed Mr. Dutchie in a

small office at the jail.  (Approximately fifteen to sixteen hours had passed since the shooting,

giving Mr. Dutchie sufficient time to sober up.)  No one else was present during the recorded

interview, which lasted one hour and seventeen minutes.[5]  Mr. Dutchie was not handcuffed.

Agent Larson, who was dressed in casual street clothes, was not armed.

Agent Larson introduced himself, stated twice that he was an agent with the FBI, showed

Mr. Dutchie his identification, and explained that his job was to investigate the death of Jennifer

Cantsee.  Agent Larson then asked Mr. Dutchie, "[W]ould you be willing to talk with me about

what happened last night?"  (Tr. of Nathan Dutchie Interview at San Juan Jail (Gov't Ex. 5)

[hereinafter "Interview Tr."] at 1.)  Mr. Dutchie responded, "Yea."  (Id.)  Then, Agent Larson

said:

> Okay.  You are not charged with any crimes right now.  Um, you're not, uh, you
> know, you've [sic] just here being held at the jail.  So, because you're in custody,
> I'm going to go ahead and read you your rights.  I want you to understand what
> your rights are.  We are conducting an investigation into the death of Jennifer
> Cantsee and I'd like to talk to you about that.  But you don't have to talk with us if

---

[5]The audio recording of the interview was submitted in electronic (CD) format (see Gov't
Exs. 2, 3, and 4), and a transcript of a portion of the interview (prepared by an investigator from
the Utah Federal Defender's Office) was also admitted into evidence (see Gov't Ex. 5; 1st Tr. at
57).

you don't want to.

(Id. (emphasis added).)  At that point, Mr. Dutchie asked, "So she is gone?", and Agent Larsen said "Yea she actually did pass away last night.  I'm sorry to have to tell you that."  (Id.)

Mr. Dutchie became, in Agent Larson's words, "very animated and emotional, cried and wailed[.]"  (1st Tr. at 55.)  At one point, he was bending over a trash can dry-heaving.[6]

During that time, Agent Larson said, "It is time for us to do the right thing for Jennifer, okay.  Do a good job for her.  All right bud?"  (Interview Tr. at 2.)  Mr. Dutchie asked, "So I am going to go to prison for it?"  (Id.)  Agent Larson responded, "I don't know, okay.  Sounds to me like it was an awful, an awful accident last night.  Things just got a little out of control.  That is what it sounds like to me.  I'm going to go ahead and advise you of your rights okay?"  (Id.)

At that point, Agent Larson showed Mr. Dutchie a consent form titled "Advice of Rights" (see Gov't Ex. 6) and asked, "Do you want to read along on this with me?"  (Interview Tr. at 2.)  Mr. Dutchie responded, "Go," but then began crying and asked for a minute.  Agent Larson gave Mr. Dutchie a soda, and "a few minutes passed while [Mr. Dutchie] regained his composure."  (1st Tr. at 59.)

Then Agent Larson again pulled out the consent form to read to Mr. Dutchie.  According to Agent Larson, the form was facing Mr. Dutchie, who appeared to read silently along with the agent.  (See id. at 61.)  But Agent Larson's reading was not completely verbatim:

Let's just, let's just do this for Jennifer, okay?  Let's take care of business.  Um,

---

[6]Later in the interview, Mr. Dutchie said, "Got a hangover a little bit.  I was throwing up this morning."  (Interview Tr. at 25.)  Agent Larson testified that Mr. Dutchie did not throw up during the interview, but made dry-heaving "noises."  (1st Tr. at 70.)  Agent Larson said he did not believe that Mr. Dutchie's emotions were "genuine."  (Id.)

8

just understand that, uh, that you don't have to talk to us if you don't want to, okay?  [The form said "You have the right to remain silent," but that sentence was not read.]  Um, we are conducting an investigation and our results are going to be forwarded to the court. *[At this point, Agent Larson begins reading the form verbatim.]*  **Anything you say could be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present you have the right to stop answering** *(Sound of a soda can opening)* **at any time.  I have read the statement of my rights and I understand what my rights are.  At this time I'm willing to answer questions without a lawyer present.** *[The verbatim reading ended here.]*  Like I said I, I don't have a lot of questions for you.  I think it looks like what happened last night was just it, kind of a horrible, horrible accident.  Okay.  I feel badly for you.  I feel badly for the Cantsee family.  Um, but, uh, you know, we just have to finish up our investigation and, and get on with it, right?  We go to do what is right for Jennifer.  So if you'd be willing to just tell me what happened.  Go ahead and sign here.[7]

(Interview Tr. at 3-4 (emphases added; bold text shows where verbatim reading of consent form occurred).)[8]  After a twenty second pause, Mr. Dutchie signed the form.[9]  (See 1st Tr. at 61; 2nd Tr. at 61; Gov't Ex. 2.)

---

[7]The parties dispute whether the last two sentences quoted above from the Interview Transcript should be separated by a comma instead of a period.  With a comma, the statement reads more like a request giving Mr. Dutchie a choice.  Separated into two phrases, it reads more like a command to sign the consent form.  Agent Larson testified that he "didn't think that there was much of a pause" and that it was "all one sentence."  (1st Tr. at 75.)  Having listened to the audio recording of the interview (approximately six minutes and fifty seconds into the recording), the court concludes that it sounds like one sentence.  (See Gov't Ex. 2.)

[8]Defense counsel dispute Agent Larson's testimony that during the interview, Mr. Dutchie said "yeah" after Agent Larson said "we just have to finish up our investigation and, and get on with it, right?"  (See 1st Tr. at 62; 2nd Tr. at 64 (defense counsel urging court to "pay close attention to that portion" of the recording).)  Although Mr. Dutchie said something while Agent Larson was speaking, it is unintelligible and the court cannot make any independent determination about what Mr. Dutchie said at that point.

[9]Mr. Dutchie emphasizes the fact that Agent Larson never asked him if he understood his rights, but because such a question is not required under Miranda, the fact is not relevant.

During the evidentiary hearing, Agent Larson testified that after Mr. Dutchie signed the consent form, he never indicated that he did not understand a question, did not ask to have any of the questions rephrased, and his answers were both short and narrative in nature.  (1st Tr. at 63.) Agent Larson also testified that throughout the interview, Mr. Dutchie gave responsive answers and appeared to understand what was being asked.  (Id. at 64-65.)

When Agent Larson was asked whether it was fair to say that Mr. Dutchie was hysterical at the beginning of the interview, he said:

> He appeared to be.  He was – he didn't actually – it's difficult to explain, but there weren't a lot of tears coming out as he was making all this noise, and he was also sort of bending over the trash can like he was going to throw up, but he never did throw up, although a lot of those types of noises. . . . He was making [dry heaving] noises. . . . [But] my perception there at the time was that the emotion was not genuine.

(Id. at 69-70.)

Later in the interview, Agent Larson, not believing Mr. Dutchie's version of events, urged Mr. Dutchie to tell the truth.  The issue of lawyers came up.

AGENT LARSEN:   . . . [T]he first step is telling the truth and getting it all out. If you leave it inside you, it is just going to fester.  Be like an infection.  You have got to be honest with yourself.  Just start from the beginning.

DUTCHIE:   Are they going to give me a lawyer or something?

AGENT LARSEN:   Absolutely.  Yea you can have a, you can pick your own lawyer or if you can't afford one the Government pays for your lawyer.  You don't have to pay anything and they are good lawyers too.  Do you want to continue to talk to me and tell me what happened?  Are you going to start at the beginning and tell me the whole truth Nathan or are you saying that you don't want to talk anymore?  I need to know.  If you don't want to talk and you want to talk to your lawyer, I'll get up and leave right now.  I've got stuff

                                    to do.  Don't waste my time.

DUTCHIE:            Lawyers aren't no good too.

AGENT LARSEN:       Well that's up to you. . . . [D]o you want me to get up right
                    now and go start talking to the lawyers, get you a lawyer
                    and do all that?  It's up to you Nathan.  It is . . .

DUTCHIE:            What's lawyers and stuff?

AGENT LARSEN:       . . . this is your case.

DUTCHIE:            What they gonna do if I talk with a lawyer?  What's the
                    difference between a lawyer and you?

AGENT LARSEN:       A lawyer, I'm just an investigator.  I investigate crime.  I
                    gather all the facts.  A criminal defense attorney, their job,
                    their specialty is defending people are, that have been
                    charged with crimes or people that are in trouble.  That's
                    what they do.  They give you advice.  If you have questions,
                    they answer your questions for you.  If you wanna, if you
                    want to stop talking and talk to an attorney, that's fine.  I
                    don't care.  That's your right.  We'll take the story that you
                    told so far and that's the story I'll take to the United States
                    Attorney's Office.

. . . .

DUTCHIE:            I do wanna keep talking to you.

(Interview Tr. at 26-27.)

       At one point during the interview, Mr. Dutchie said, "I know I am going to go [to prison]

for a long time."  (Interview Tr. at 24.)  When asked why he thought that, Mr. Dutchie said his

brother had been in prison for eighteen years for committing murder, and that "I always watch

[the television show] Cops and I know everybody goes to prison for a long time when they do

murders, first degree or the second degree."  (Id. at 25.)  Agent Larson asked him if he knew

what second degree murder means.  Mr. Dutchie replied, "That means you did it and you get life.

                                          11

No parole." (Id.)

**C.**      **Mr. Dutchie's Ability to Understand His Rights and Implication of His Waiver**

The above exchanges between Agent Larson and Mr. Dutchie have been highlighted by the parties because Mr. Dutchie's attorneys contend that Mr. Dutchie did not have the mental capacity to understand his rights as they were administered, much less the implications of waiving such rights.

The parties called factual and expert witnesses to provide testimony on the subject. The Government called Mr. Dutchie's mother, Annie Lee Rabbit, to testify about Mr. Dutchie's English and Ute language skills. The Government also submitted evidence of Mr. Dutchie's criminal record. Defense counsel called Marion Deware, Mr. Dutchie's adult education teacher, and Dr. William Eggington, a linguistics expert.

**1.**      **Mr. Dutchie's Language and Reading Skills**

**a.**      Annie Lee Rabbit's Testimony

Mr. Dutchie is an enrolled member of the Ute Mountain Ute Indian Tribe. He speaks both English and Ute, although he was educated in English speaking schools. Mr. Dutchie and his mother communicate with each other using a combination of Ute and English. Ms. Rabbit, who is not only Mr. Dutchie's mother but also a translator for the Ute Indian Tribe, testified that Mr. Dutchie "doesn't really speak Ute that well." (1st Tr. at 86.) She also opined that he does not speak or understand the "bigger [English] words" very well. (Id.)

**b.**      Marion Deware's Testimony

Marion Deware was Mr. Dutchie's adult education teacher in the Tooele County School District. She specializes in evaluating reading skills and teaching reading skills to adults. She

assessed Mr. Dutchie's reading ability in September 2007 (after he had been arrested) using the "easy" version of the standardized T.A.B.E. test ("The Adult Basic Education" test).  Overall, he scored "a third grade third month" level (1st Tr. at 91), meaning that, in general, Mr. Dutchie has absorbed the education of a third grader in his third month of school.

The T.A.B.E. test is not an IQ test, and Ms. Deware acknowledged that a person can be intelligent, even have a high IQ, but not be able to read.  She also acknowledged that the test does not have built-in markers to determine whether the test-taker is answering honestly or working up to his potential.  (Despite Ms. Deware's acknowledgment, there is no evidence to support the conclusion that Mr. Dutchie manipulated the test results.)

c.      Dr. William Eggington's Testimony

Counsel for Mr. Dutchie presented the testimony of Dr. William Eggington, who is a professor of linguistics.  According to Dr. Eggington, "Linguistics is the scientific study of language."  (1st Tr. at 103.)  "Forensic linguistics is the application of linguistics study to legal issues."  (Id.)

He was hired to analyze the linguistics of the Miranda warning given to Mr. Dutchie, to opine about "what level of reading a person would have to have in order to understand what's in [the] Miranda [warning]" (1st Tr. at 101), and to opine about whether Mr. Dutchie understood his rights and knowingly waived them during the August 13, 2007 interview.  Dr. Eggington, applying his expertise in forensic linguistics, formed his opinion after reviewing the Interview Transcript, listening to the audio recording of the interview, reviewing records of ten years of Mr. Dutchie's educational history, speaking with Ms. Deware, and reviewing the results of the test administered by Ms. Deware.

13

The Government objected, arguing that the proffered testimony lacked relevance because Dr. Eggington had never spoken with Mr. Dutchie.  Over the Government's objection, Dr. Eggington was allowed to testify.  Because his testimony was too extensive to summarize, only the highlights will be discussed here.

First, Dr. Eggington concluded that the "standard <u>Miranda</u> [warning], which is I think the one that was used in this case, is pitched at an eighth grade reading level, which means that somebody who [reads at the eighth grade level] will comprehend 50 percent of the <u>Miranda</u> [warning].  For 100 percent you need [to read at the] 11.6 grade level."  (1st Tr. at 109.)  He reached this conclusion in part based on his professional opinion that "high code" permeates the <u>Miranda</u> warning.  "High code" is another way of saying "fancy language" that "educated speakers can understand but other non-educated people can't understand."  (2nd Tr. at 52.)  He pointed to the phrase "the right to" as an example of high code, because it has seven different meanings, four of which are found in the Advice of Rights that Agent Larson read to Mr. Dutchie, and some of which were used by Agent Larson during the interview.  He explained the meanings as follows:

> [Y]ou have . . . right [versus] wrong, right [versus] left, the conversation right, meaning ["Let's get on with the interview, right?"], [the] intellectual right, meaning "Right, I understand," the human right notion, the right as in right angle, and then you're right as a marker for okay.

(1st Tr. at 112.)  He stated further that "when somebody doesn't understand the – comprehend the meaning of a particular word, it's just noise.  It just gets washed over."  (<u>Id.</u> at 113.)  Dr. Eggington concluded—given the <u>Miranda</u> warning's high code, the reading level required to understand the warning, and Mr. Dutchie's third grade reading level—that "it's likely in my

opinion that [Mr. Dutchie] has [his <u>Miranda</u> rights] confused with the other rights." (<u>Id.</u>)

Defense counsel asked Dr. Eggington, "If Mr. Dutchie does in fact read on a third grade

level, would [reading along with Agent Larson] make his comprehension of <u>Miranda</u> . . . better

or worse . . .?" (<u>Id.</u> at 114.)  His answer, in essence, was that it would be worse.  This is his more

involved explanation:

> Especially the way that the agent read along with him, he read it – the agent was
> reading it along as if it was ritual.  Obviously the agent had done this many times,
> and so he was reading – he was going through the reading the rights ritual.  He
> was going through at conversational speed, and it would have been impossible in
> my opinion for Mr. Dutchie to comprehend – to read at that speed, to process –
> this is realtime processing – to process this complex language at that speed and to
> comprehend it.

(<u>Id.</u>)

Dr. Eggington also concluded that Mr. Dutchie, who speaks both Ute and English, falls

into the "Generation 1.5" category, which means that Mr. Dutchie is "halfway between both

languages, and it's very difficult for those folks to comprehend high level language in both

codes." (2nd Tr. at 42.)  According to Dr. Eggington, this status limits Mr. Dutchie's ability to

comprehend either language to the adult level of proficiency that a native speaker of either

language would reach, even though he was educated in English-speaking schools.  And that

negatively affected his ability to understand <u>Miranda</u>.

Given all of the above, Dr. Eggington ultimately opined that "Mr. Dutchie did not

understand that he was waiving his rights" (1st Tr. at 120) when he signed the consent form and

agreed to talk to Agent Larson.

On cross examination, Dr. Eggington noted that "reading comprehension is very different

from oral comprehension." (2nd Tr. at 9.)  He acknowledged that "a person could be very

familiar with the meaning of a word and not know how to spell it." (Id. at 11.)  He also admitted

that when he tested Mr. Dutchie,[10] "Mr. Dutchie was very well aware that whether he understood

or didn't understood [sic] the Miranda [warning] was an issue." (Id. at 12.)  And he essentially

agreed that his opinion was "based in part on assuming that [Mr. Dutchie was] not somebody

who was dealing with the law frequently." (Id. at 14.)  He did say, however, that even if Mr.

Dutchie had been arrested multiple times before, that fact would not change his opinion.  "If

someone has not got the comprehensibility to understand what's going on, then often it doesn't

matter how frequent they get the exchange . . . because it's all noise." (Id. at 15.)

   Dr. Eggington also acknowledged that the Interview Transcript shows Mr. Dutchie's

proper use and understanding of different meanings of the word "right." (See 2nd Tr. at 17-20.)

One of those uses of "right" occurred when Agent Larson stated, "they've got a right to know,"

to which Mr. Dutchie responded, "I know they do." (See id. at 19.)  Dr. Eggington

acknowledged that this was "the same kind of right as you have a right to remain silent" (the

"high code" in Miranda), and that Mr. Dutchie appeared to understand what Agent Larson was

talking about. (Id.)  He also admitted that the statement "You don't have to talk to us if you

don't want to" (which Agent Larson used) would be easier to understand than the phrase "You

_____

[10]After defense counsel's direct examination of Dr. Eggington, the court had to stop the
hearing and continue it eleven days later.  During the recess period, Dr. Eggington interviewed
and tested Mr. Dutchie.  That information was brought out during the second part of the
evidentiary hearing, over the Government's objection.  Because Dr. Eggington had already
formed his opinion about Mr. Dutchie's understanding, because his interaction with Mr. Dutchie
occurred after Mr. Dutchie had listened to Dr. Eggington's earlier testimony, and because the
interview occurred between direct examination and cross examination, the court places very little
weight on that part of Dr. Eggington's testimony.  Accordingly, much of his testimony on re-
direct, which may be found in the transcript of the April 22, 2008 hearing, will not be discussed
at any length.

have the right to remain silent." When counsel raised the issue of whether Mr. Dutchie was only partially proficient in both Ute and in English, the court asked, "Does it make any difference to your opinion, Mr. Dutchie who is represented by very competent counsel who can request an interpreter, that his defense team has chosen not to have an interpreter here?" (2nd Tr. at 45.) His response: "I would have to say yes." (Id.)

   2.    **Mr. Dutchie's Familiarity with the Criminal Justice System**

   The United States submitted documentation of Mr. Dutchie's arrest record. (See Gov't Ex. 8.) During the evidentiary hearing, the Government noted that before Mr. Dutchie was arrested and charged with second degree murder, he had been arrested twelve times. (See 2nd Tr. at 58-59.) The arrest record also shows that Mr. Dutchie has been represented a public defender at least once before, that he pleaded guilty to a number of charges (mostly related to intoxication and disorderly conduct), went to trial on two charges of shoplifting, and spent some time in jail for various offenses.

**CONCLUSIONS OF LAW**

   Mr. Dutchie seeks an order suppressing all evidence seized from inside his house and all statements made by Mr. Dutchie on August 12, 2007, and August 13, 2007. For the reasons set forth below, the court grants Mr. Dutchie's motion in part and denies Mr. Dutchie's motion in part as follows.

   First, Mr. Dutchie's initial statement, made on August 12, 2007, in response to Deputy Adams' question "Where is the gun?" is admissible. But the remainder of statements made by Mr. Dutchie while he was detained at the scene, including Mr. Dutchie's description of the gun, are inadmissible.

Second, the court holds that the gun itself is not admissible.  The bullets found in plain view in Mr. Dutchie's room are admissible, but the bullets found on the coffee table are not admissible.  And any other evidence seized from Mr. Dutchie's house during the search by Deputies Adams and Dyer (to the extent there is any) is not admissible.

Finally, the court holds that Mr. Dutchie's statements to Agent Larson on August 13, 2007, are admissible because his waiver was knowing, intelligent, and voluntary.

A.      **August 12, 2007 Questions and Search**

   1.      **The Public Safety Exception to Miranda Partially Justifies the Officers' Questions at the Scene.**

In New York v. Quarles, 467 U.S. 649 (1984), the United States Supreme Court recognized a "narrow exception to the Miranda rule" that custodial interrogation may only occur after the suspect's rights have been communicated to him.  See id. at 658-59.  Under Quarles, when the immediate safety of the public or officers[11] is at risk, questions necessary to secure their safety without first giving a Miranda warning do not violate the defendant's Fifth Amendment rights.  "[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."  Id. at 657.  Here, as in Quarles, the questions were proper if they related "to an objectively reasonable need to protect the police or the public from any immediate danger

---

[11]This exception applies not only when the public is at risk but when officers are at risk. "We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect."  Id. at 658-59 (emphasis added).  See also United States v. Lackey, 334 F.3d 1224, 1228 (10th Cir. 2003) (quoting Quarles, and holding that exception in Quarles "undoubtedly extends to officers' 'questions necessary to secure their own safety.'").

associated with the weapon."  <u>Quarles</u>, 467 U.S. at 659 n.8.

It is undisputed that on the evening of August 12, 2007, Mr. Dutchie was in custody and was not given a <u>Miranda</u> warning.  Accordingly, the Government relies on the public safety exception to support its contention that the questions Deputies Adams and Dyer asked Mr. Dutchie concerning the gun were proper and that Mr. Dutchie's responses are admissible.  The court agrees only in part.

Deputy Adam's initial question—"Where is the gun?"—which he asked right after Mr. Dutchie and Mr. Nelson were placed in custody but before the officers entered the house, was "reasonably prompted by a concern" for officer safety.  <u>See id.</u> at 656.  Deputy Adams reasonably asked about the gun's whereabouts knowing that the officers had to secure the crime scene, including the house, and tend to the victim, if necessary.  After Mr. Dutchie and Mr. Nelson were taken into custody, the officers did not know whether anyone else was in the house (they reasonably did not trust the suspect's statements that no one else was inside).  They knew a shooting had occurred, they had a body lying in the carport right next to the house (but they did not know who had shot Ms. Cantsee), no gun was visible near the body, and two suspects came out of the house unarmed.  These facts justify the question, and so Mr. Dutchie's response (<u>see</u> 1st Tr. at 10) is admissible.

But the question asking Mr. Dutchie to describe the gun was not necessary to secure the officers' safety.  Any unsecured gun would have been a reasonable focus for the officers.  Accordingly, Mr. Dutchie's response to that question is not admissible.

However, the questions the officers asked after Deputies Adams and Hillhouse determined that no one was in the house were not reasonably necessary to secure the officers' or

the public's safety.  The public safety exception is narrow and is "circumscribed by the exigency which justifies it."  Quarles, 467 U.S. at 658.  See also United States v. Brathwaite, 458 F.3d 376, 382 n.8 (5th Cir. 2006) ("'When the danger inherent in a confrontation has passed, so has the basis for the [public safety] exception.'") (quoting Fleming v. Collins, 954 F.2d 1109, 1114 (5th Cir. 1992) (en banc)).

Contrary to the Government's assertion, the fact that the officers had not located the handgun and the fact that the back door was wide open when they first entered the house do not justify the continued questioning.  If the gun was inside, it was not accessible to anyone other than Deputy Adams, who stayed in the house after searching for (but not finding) other individuals.  (It is telling that the officers showed no concern for the rifles in the gun cabinet.)  If the gun was outside, the actions and questions of the officers belie any suggestion that they were truly concerned about it.  They focused on the inside of the house and, except for Deputy Adams' quick glance outside the back door, there is no evidence that they went outside to look.  The only identifiable suspects were already in custody, so they posed no threat.  The scene had been secured, inside and out (backup officers had been called to control the crowd forming in front of the house).  When they continued the questioning about the gun, the officers did not have information suggesting that an immediate danger existed.  See Brathwaite, 458 F.3d at 382 n.8 (holding that public safety exception did not make unwarned statements admissible, because "[t]he government's contention that a public safety concern existed in that a member of the public, including school children, might find a gun outside the house is undermined by the questioning itself – [the agent] testified that he asked [the defendant] repeatedly 'Are there any guns in the house?', and never testified as to asking him about any guns located anywhere

20

else . . . .  [S]weeps had been done, the occupants were handcuffed, and the immediacy of the

situation had passed . . . .").  Brathwaite is persuasive because the facts here a sufficiently

similar.  Here, as in Brathwaite, the immediacy of the situation had passed.  Accordingly, all of

Mr. Dutchie's statements at the scene after Deputy Hillhouse announced that "the house was

clear" (1st Tr. at 15) are not admissible.

> ### 2. Officers' Warrantless Search of Mr. Dutchie's House

Because the officers did not have a warrant to search Mr. Dutchie's house, the

Government, to prevail, must establish the applicability of one of the limited exceptions to the

warrant requirement.

> #### a. Protective Sweep

One of those exceptions to the warrant requirement is the "protective sweep" rule.  "A

'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted

to protect the safety of police officers or others.  It is narrowly confined to a cursory visual

inspection of those places in which a person might be hiding."  Maryland v. Buie, 494 U.S. 325,

327 (1990).  The Supreme Court held in Buie that,

> as an incident to the arrest the officers, could, as a precautionary matter and
> without probable cause or reasonable suspicion, look in closets and other spaces
> immediately adjoining the place of arrest from which an attack could be
> immediately launched.  Beyond that, however, we hold that there must be
> articulable facts which, taken together with the rational inferences from those
> facts, would warrant a reasonably prudent officer in believing that the area to be
> swept harbours an individual posing a danger to those on the arrest scene.

Id. at 334.  The Court warned that the sweep must be "no longer than is necessary to dispel the

reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and

depart the premises."  Id. at 335-36.

The Government does not rely on the "protective sweep" exception to the warrant requirement because it contends that the search conducted by the officers was not incident to an arrest (i.e., Mr. Dutchie was in custody but not under arrest at the time). See United States v. Freeman, 479 F.3d 743, 750 (10th Cir. 2007) (emphasizing that protective sweep only applies when done incident to an arrest). But the court finds that a *de facto* arrest occurred.

It is often said that a *de facto* arrest has occurred "when 'a reasonable man in the suspect's position would have understood his situation' . . ., to be tantamount to being under arrest." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). Also, courts generally look at the intrusiveness of the encounter and the traditional indicia of arrest (for example, the use of handcuffs and police officers' display of firearms) to determine whether an encounter constitutes an arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1051-52 (10th Cir. 1994).

Here, Mr. Dutchie was ordered to come out of the house with his hands up, was approached by officers displaying weapons, and was immediately handcuffed and placed on the ground next to a patrol car. He was guarded by Deputy Dyer and remained there for the entire evening before being transported to the San Juan County Jail. The situation went beyond an investigatory stop. A reasonable man in Mr. Dutchie's position would have believed he was under arrest.

The question then becomes whether Mr. Dutchie's house was a space "immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 334. The court finds that it was. See, e.g., United States v. Cavely, 318 F.3d 987, 995-96 (10th Cir. 2003) ("[C]ourts have recognized that the same exigent circumstances present in Buie

22

can sometimes accompany an arrest just outside of a residence or other structure. Depending on the circumstances, the exigencies of a situation may make it reasonable for officers to enter a home without a warrant in order to conduct a protective sweep.") (collecting cases); United States v. Soria, 959 F.2d 855, 857 (10th Cir. 1992) (holding that protective sweep of adjoining auto body shop, after owner was arrested outside, was valid because officers only conducted a cursory search "to protect themselves from possible gunshot fire from within"); United States v. Tisdale, 921 F.2d 1095, 1097 (10th Cir. 1990) (upholding protective sweep of trailer home after defendant, who had history of firearms violations, fled and officer heard three gunshots).

Here, the police officers had just responded to a shooting. Deputy Adams saw two men flee into the house, but he did not witness the shooting so he did not know if more than two persons were in the house. Because a shooting had occurred, and a body lay on the carport floor (the area from which the men were fleeing), it was reasonable to assume that a shooter with a gun was still on the premises. The officers had no idea whether Mr. Dutchie and Mr. Nelson were the only suspects. Plus, neither of them had a gun when they left the house into which they had originally fled. The officers could reasonably suspect that another person was still inside the house with the gun.

For these reasons, the court finds that the protective sweep conducted by Deputies Adams and Hillhouse was reasonable. Consequently, the ammunition found in plain view is admissible. See, e.g., Buie, 494 U.S. at 330 (noting that if entry was lawful under protective sweep exception, then evidence in plain view that was seized by an officer who had probable cause to believe it was evidence of a crime was admissible); United States v. Angelos, 433 F.3d 738, 747 (10th Cir. 2006) (evidence in plain view during authorized protective sweep was legally seized).

23

But once they had secured the house by determining that no third suspect was hiding in the house, they should have stopped there, even though they did not find the gun.  A protective sweep is designed to eliminate the threat that a third person would immediately attack the officers.  See United States v. Colbert, 76 F.3d 773, 777 (6th Cir. 1996) ("The facts upon which officers may justify a Buie protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest[.]").  Without a person, it is irrelevant that no weapon was found.

For this reason, the court finds the continued search of the house, which eventually yielded the handgun as evidence, far exceeded the narrow scope of search allowed under Buie.  Accordingly, the gun is not admissible under the theory of a protective sweep.

       b.    Exigent Circumstances

The Government contends that the search for the gun was reasonable based on exigent circumstances.  Warrantless searches are valid under the exigent circumstances exception "when the circumstances posed a significant risk to the safety of a police officer or a third party." United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006).  Following the Supreme Court's decision in Brigham City, Utah v. Stuart, 547 U.S. 398 (2006), the court now applies a two-part test to determine whether the exigent circumstances exception applies: (1) whether "the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others," and (2) whether "the manner and scope of the search is reasonable." Najar, 451 F.3d at 718.  Applying this test, the court finds that the search for the gun does not satisfy the elements of the exigent circumstances exception.

As discussed above, it may have been reasonable to enter the house to conduct a

protective sweep, but once the officers determined that no one else was in the house, they should have stopped searching because they had eliminated the concern that an emergency existed. "The mere statement that firearms are present, standing alone, is insufficient.  The government must go further and demonstrate that the presence of firearms raised a concern for the officer's safety."  United States v. Moore, 91 F.3d 96, 98 (10th Cir. 1996).

The court is not persuaded by the Government's argument that it was logical and necessary for the officers to eliminate the possibility that the gun was inside before going outside to look for it.  The entire basis for the officers' concern was that a third suspect might still have the gun inside or that the gun was outside and accessible to a third suspect or member of the public.  Soon after sweeping through the house, they knew the house was secure.  Early on in their search, they eliminated the only basis for their concerns about the house.  Yet they continued searching for the gun in the secured house until they found it, ten minutes after entering the house.  Also, they suggested that if the gun was outside, it too posed a threat because an unidentified third suspect or a member of the public could find the gun.  But they did not look outside, and so their actions belie any claim of urgency.

Moreover, the manner of the search was unreasonable because it was not limited to those areas where a person could be found.  Although the officers were allowed to look in the different rooms in the home and check in closets large enough to conceal a person, they were not allowed to look under the mattress or lift up the couch to look between the wall and the couch, because neither of those places could hide a person.

Because the gun and the ammunition on the coffee table were found during the unauthorized portion of the search, they are not admissible.

**B.**     **August 13, 2007 Interview of Mr. Dutchie**

There is no dispute that Agent Larson gave Mr. Dutchie the <u>Miranda</u> warning before

beginning the interview and that Mr. Dutchie signed the waiver of rights form.  The dispute here

is whether, given the totality of the circumstances, Mr. Dutchie understood his rights and the

consequences of waiving those rights.  For the reasons set forth below, the court finds that he did.

**1.**     **Applicable Standards**

The United States Supreme Court in <u>Miranda v. Arizona</u> established that if a defendant is

subject to custodial interrogation, he must be advised of his rights (the right to remain silent, the

right to the presence of an attorney, and the right obtain counsel before questioning at no cost to

an indigent defendant) and then warned about failing to remain silent, before any of his

statements can be used by the prosecution at trial.  384 U.S. 436, 444 (1966).  Law enforcement

need only convey the "substance" or "essence" of the defendant's rights.  <u>United States v.</u>

<u>Bustillos-Munoz</u>, 235 F.3d 505, 517 (10th Cir. 2000).

A defendant who has been given a <u>Miranda</u> warning may waive his rights if the waiver

was made voluntarily, knowingly and intelligently.  <u>Miranda</u>, 384 U.S. at 444.  "Only if the

'totality of the circumstances surrounding the investigation' reveal both an uncoerced choice and

the requisite level of comprehension may a court conclude that the <u>Miranda</u> rights have been

waived."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  Waiver need not be express; it may be

inferred from the defendant's actions and words.  <u>United States v. Toro-Pelaez</u>, 107 F.3d 819,

825 (10th Cir. 1997).

To determine whether a waiver was made voluntarily, knowingly, and intelligently, the

court must look at two factors.  "First, the relinquishment of the right must have been voluntary

in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Burbine, 475 U.S. at 421 (internal citations omitted).  Only the second factor is relevant here.[12]

### 2.      Mr. Dutchie's Comprehension

Mr. Dutchie relies on the Interview Transcript and expert opinions to support his contention that he did not understand the rights he was waiving, much less the consequences of waiving the rights.

Mr. Dutchie relies heavily on the testimony of Dr. Eggington.  But the court does not find Dr. Eggington's testimony particularly persuasive.  His testimony was highly theoretical.  He essentially testified that any individual whose reading skills do not equal or exceed the reading skills of a theoretical eleventh grader in his six month of school will not be able to fully understand the "high code" of the Miranda warning administered by law enforcement officers throughout this country every day based on United States Supreme Court precedent.  According to Dr. Eggington, because Mr. Dutchie reads at a third grade level, barring all else, he could not, and therefore did not, understand his rights or the consequences of his waiver of rights.

The court must look to the totality of the circumstances.  Dr. Eggington's testimony and opinion did not consider the practical reality of the situation before the court.  Moreover, the Government brought out during its cross-examination of Dr. Eggington that certain facts

---

[12]The first factor is not at issue, because Mr. Dutchie does not contend that he was coerced into signing the waiver form or talking to Agent Larson.  But even if he did so contend, nothing in the record shows coercion.

apparent from the Interview Transcript are inconsistent with Dr. Eggington's opinion.  For

example, Agent Larson twice stated that Mr. Dutchie did not have to talk to Agent Larson if he

did not want to.  Dr. Eggington acknowledged that that was not "high code" like the warning's

"right to remain silent" language.  He also acknowledged that during the interview, Mr. Dutchie

demonstrated his understanding of the different meanings and uses of "right," which does not

suggest that Mr. Dutchie, with such purportedly limited language skills, could not properly

communicate or evaluate the things Agent Larson was saying.

Dr. Eggington did not consider Mr. Dutchie's criminal background or familiarity with the

criminal justice system.  He apparently placed little, if any, emphasis on the fact that Mr. Dutchie

was coherent during the interview, appeared to understand the questions, and answered in a

manner that was appropriate given Agent Larson's line of questioning.  He dismissed Mr.

Dutchie's ability to communicate during the interview as a "street level" form of communicating,

rather than the "high code" that makes up Miranda.

Furthermore, case law supports a conclusion contrary to Dr. Eggington's professional

opinion.  For example, in Smith v. Mullin 379 F.3d 919 (10th Cir. 2004), the Tenth Circuit found

that a defendant whose cognitive abilities mirrored those of a twelve-year old ("Every doctor

who examined him placed his intellectual functioning in the range of mild to borderline mental

retardation") nevertheless knowingly and intelligently waived his Miranda rights.  See id. at 933.

In that case, a clinical neuropsychologist testified on behalf of the defendant and concluded, after

administering a "Grisso test" (designed to test one's ability to waive Miranda rights), that the

defendant could not knowingly and intelligently waive his Miranda rights.  This did not persuade

the trial court or the Tenth Circuit, which found under the totality of the circumstances that the

28

defendant did in fact knowingly and intelligently waive his <u>Miranda</u> rights.   The appellate court noted that "while Mr. Smith's intellectual functioning was limited, [the clinical neuropsychologist] testified that [the defendant] would understand the role of police officers and the concept of a criminal charge." <u>Mullin</u>, 379 F.3d at 933.  Also, the lone fact that the defendant's cognitive abilities were that of a twelve-year-old "does not render his waiver ineffective." <u>Id.</u> at 933-34.  The Court also found it significant that the defendant understood the questions posed to him by the officers, and that he had "prior experience with the criminal justice system.  In 1986, he retained counsel to defend him on an assault charge, eventually pled guilty, and served time in prison.  The concepts encompassed by <u>Miranda</u> were not foreign to him." <u>Id.</u> at 934.  The same can be said of Mr. Dutchie.

The one distinguishing factor of <u>Smith v. Mullin</u> is that the officers slowly walked the defendant through the <u>Miranda</u> rights and the defendant stated that he understood those rights. But the fact that Agent Larson did not ask Mr. Dutchie if he understood his rights is not dispositive.  The court looks at the totality of the circumstances, "where no single factor . . . is dispositive." <u>United States v. Burson</u>, 531 F.3d 1254, 1258 (10th Cir. 2008).

According to the Tenth Circuit, "a defendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination." <u>Id.</u>  The facts of this case show that Mr. Dutchie was not impaired to a substantial degree.  Although his reading abilities may not be higher than a theoretical third grader, his ability to understand what was going on around him and the consequences of his actions was apparent from the Interview Transcript and the audio recordings submitted by the Government.

Under the totality of the circumstances, the court holds that, on August 13, 2007, Mr. Dutchie knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights.  Accordingly, his statements to Agent Larson are admissible.

## ORDER

For the foregoing reasons, Defendant Nathan Dutchie's Motion to Suppress is GRANTED IN PART AND DENIED IN PART as follows:

1.      Mr. Dutchie's first statement on August 12, 2007, about the handgun's whereabouts is admissible.  The remaining statements made at the scene that evening are inadmissible.

2.      The handgun is not admissible.  The ammunition found in Mr. Dutchie's room during the protective sweep is admissible.  The ammunition found on the coffee table is not admissible.

3.      Mr. Dutchie's statements to Agent Larson during the August 13, 2007 interview are admissible.

SO ORDERED this 2nd day of September, 2008.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge